**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEPHEN SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-597 |
| | ) | Judge Nora Barry Fischer |
| | ) | |
| INTEGRAL CONSULTING SERVICES, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | | |

**MEMORANDUM OPINION**

I.  INTRODUCTION

In this diversity action, Plaintiff Stephen Smith ("Smith") asserts claims of fraudulent inducement, negligent misrepresentation and breach of contract against Defendant Integral Consulting Services, Inc. ("Integral").  (Docket No. 1-1).  Smith's claims arise from offers of employment extended to him by Integral to work as an intelligence analyst at its Charlottesville, Virginia location and caused him to resign from a similar position for another company in Afghanistan and return to the United States, at which time Integral rescinded its offer of employment.  (*Id.*).  Presently before the Court is Integral's Motion to Dismiss arguing that this Court lacks personal jurisdiction over it, which Smith opposes, asserting that Integral's contacts with him are sufficient to confer specific personal jurisdiction over Integral in Pennsylvania.  (Docket Nos. 7, 15, 16, 18).  Along with their briefing, the parties have also presented competing affidavits and other documentary evidence, including email communications.  (Docket Nos. 1-1, 7, 15, 16, 18).  Upon consideration of the parties' arguments, and for the following reasons, Integral's Motion to

Dismiss is granted and this matter is transferred to the United States District Court for the District of Maryland.

II. FACTUAL BACKGROUND

Smith is a native of Butler County, Pennsylvania, an area which he considers home and where his parents and girlfriend resided throughout the events in question. He is a veteran of the United States Air Force and has over ten years of experience as an intelligence analyst. (Docket No. 7-1). Smith's military career led him to serve out of bases in Germany from 1999-2002 and South Carolina from 2002-2004. (*Id.*). Subsequent to his military service, in 2004-2005, he worked as a commercial truck driver for a private company for a period of two years in Illinois. (*Id.*). He spent the next four and a half years (2005-2011) working as an intelligence analyst for the United States Army in Hawaii. (*Id.*). Smith then returned to the continental United States and worked in similar positions for government contractors in Virginia, the last of which was in Charlottesville, where he maintained an apartment. (*Id.*).

In March of 2012, while Smith was still working in Charlottesville for a former employer, he was under consideration for a position with Integral in the same area. (Docket No. 15 at ¶ 6). Integral is a Maryland corporation and maintains its headquarters in Maryland where some of the executives and human resources professionals with whom Smith had contact worked. (Docket No. 1-2 at ¶ 4). Around this time, Integral was bidding on a long-term federal contract (the "BIP contract") and was confident that it would receive the BIP contract. (Docket No. 15 at ¶ 6). Integral was interested in hiring Smith as an intelligence analyst in the event that it received the BIP contract, at which time it would have intelligence analyst duties for him to perform. (*Id.*).

The discussions between Smith and Integral were ongoing when Smith's contract with his

prior employer expired in March of 2012. Smith then told an unspecified individual at Integral that he could no longer afford to live in Charlottesville and would be relocating to Pennsylvania until Integral had work for him. (*Id.* at ¶¶ 7-11). He also advised that he would be willing to return to Virginia in the event that the contract was awarded. (*Id.* at ¶ 10). According to Smith, Integral encouraged him to stay in Charlottesville and offered to pay his lease on his apartment while it awaited the government's decision on whether to award the contract to Integral. (*Id.* at ¶ 8).

Smith avers that he returned to Butler County but maintained email and telephone communication with Integral. (*Id.* at ¶ 11). However, he also continued to rent his apartment in Charlottesville and left certain of his belongings there. (*Id.* at ¶ 13, Ex. A). Integral emailed Smith a contingent job offer on April 6, 2012, which Smith signed[1] and returned along with a copy of his resume from his location in Butler County. (Docket No. 15 at ¶ 18; Docket No. 1-2 at Ex. 1). Although it was emailed, the letter is addressed to Smith at an unlisted location in Charlottesville, Virginia. (Docket No. 1-2, Ex 1). Similarly, the resume that Smith provided to Integral indicated that he resided at an address in Charlottesville. Integral Executive Vice President Abhai Johri ("VP Johri") declares in an affidavit that neither he nor the author of the April contingent job offer letter, President Renu Johri, were aware that Smith had relocated to Pennsylvania at the time the letter was emailed to him. (Docket No. 7-2). In any event, the letter expressly states that it is "contingent" and "subject to" Integral winning the BIP contract. (Docket No. 1-2, Ex 1). The letter further provides a starting salary of $75,000, includes some benefits information and states that "[t]his is an offer for employment at will and is not in any way an offer either implied or expressed, for employment for

---

[1]        The Court notes that none of the versions of the three separate offer letters submitted by the parties bear Smith's signature. (Docket Nos. 1-2 at Exs. 1, 4, 5). However, the Court credits Smith's declarations that he signed each of these documents and Integral does not appear to contest these points.

any term or guarantee of employment for any term." (*Id.*).

On April 25, 2012, VP Johri emailed Smith and requested that he fill out a Form SF86 which was necessary in order for Smith to obtain a security clearance to work in the position. (Docket No. 15-1 at 3). Smith responded that a copy of his last SF86 and his passport were located at his apartment in Virginia and that he was planning on going "back down there this weekend." (*Id.* at 2-3). He commented that this was necessary because he was unable to "remember all [of his] addresses and things for the last 10 years" and asked if he could have until Monday to fill out the new form and return it to Integral, to which VP Johri responded "[t]hat will be fine." (*Id.*). Smith then retrieved the documents from his apartment, returned to Butler County, filled out the new SF86 Form and mailed the packet to Integral, using a Butler return address on the envelope. (Docket No. 15-1 at ¶ 15).

Smith had some additional communications with Integral around this time as he requested that Integral assist him with paying his rent at his apartment and also discussed a revised offer containing an increased starting salary. (Docket No. 1-2 at 27). To this end, on May 8, 2012, Senior IT Recruiter Katrin Kassiri wrote to Smith that Integral was going to send him a revised offer letter with a salary of $78,000 plus $2,000 for his expenses. (*Id.*). The next day, Smith emailed and asked if he was "still getting that offer" to which Kassiri responded "yes," indicating that he would receive it today. (*Id.* at 26). Smith thanked Kassiri, commenting that he really appreciated her help and also thanked her "for putting up with all [of his] calls and emails." (*Id.*). It is unclear if this revised offer was actually extended to Smith but the documents which have been presented show that on May 18, 2012, Integral made a payment to Smith's landlord purportedly to pay his rent for the months of June and July of 2012. (Docket Nos. 7-1 at ¶¶ 8-9, p. 8). On May 11, 2012, VP Johri sent out an email to

a number of individuals, including Smith, which states that "I would like to thank you for your support and signing up to be in our BIP team…. I would like to assure you (who have signed up with us now) a confirmed position on the BIP contract contingent on Integral winning the contract; and we are very confident about winning it." (Docket No. 16-2 at 2). VP Johri noted that the contract would be awarded mid-July and would start on July 30, 2012 and also stated that the company "will keep you informed on the status of the BIP proposal as we move forward, and will be in touch with you shortly for any help we need during the proposal time." (*Id.*).

In July of 2012, Smith accepted an opportunity to work with another employer, Mission Essential Personnel, in Afghanistan. (Docket No. 15 at ¶¶ 20-23). He states that he took this position because Integral still had not secured the BIP contract and he was unable to remain unemployed indefinitely. (*Id.* at ¶ 20). The new position also had a significant annual salary of $112,719.60, a large portion of which would be tax-free if he remained in the position for eleven months. (*Id.* at ¶¶ 21-22). Smith notified Integral that he accepted the position and relocated to Afghanistan, commencing his work in late July 2012. (*Id.* at ¶¶ 23-24).

Integral was awarded the BIP contract in September of 2012 and Kassiri emailed Smith asking him if he was still available. (Docket No. 1-2 at 26). Smith advised that he was in Afghanistan but said he was willing to come back "if the money is right" in an apparent effort to negotiate a higher salary. (*Id.*). He further commented that he was planning on returning to the United States in February of 2013 and may be available to work at Integral then if there was still a spot for him. (*Id.*).

Smith and Kassiri engaged in back and forth email communications over the next few days. (*Id.* at 23-26). Kassiri asked Smith if he would like to stay in Afghanistan and work from there or to

work in Charlottesville and Smith indicated that he was interested in returning and getting a place in Virginia. Kassiri advised that the company would offer him $83,000 in salary and an additional $2,000 in relocation expenses within 30 days of joining the company. (*Id.* at 25). Smith inquired about the length of the contract, joking that he did not "want to make the same mistake as last time and get there and find out the contract ended in four months. ha ha." (*Id.* at 25). Kassiri responded that the contract was for five years and that he wouldn't make a mistake because that even after five years, his position was most likely safe. (*Id.*). Upon further questioning, Kassiri told him that the start date was September 17, 2012 and that he needed to get there as soon as possible so that he would not lose his spot. (*Id.*). Smith also expressed some concern about his expenses for moving "down" to Virginia and to find a new place in two of his emails. (*Id.* at 24-25; Docket No. 15 at ¶¶ 33-34).

Ultimately, Smith said that he was interested in the position and Integral emailed him an offer letter dated September 10, 2012, setting forth a starting salary of $83,000 annually, plus benefits and $2,000 for relocation expenses, with a start date of September 17, 2012. (*Id.* at ¶ 29; Docket No. 1-2 at Ex. 4). Smith received this letter while in Afghanistan, signed it and returned it to Integral. (Docket No. 15 at ¶ 29). He then resigned his position at MEP and made arrangements to return home. (*Id.* at ¶¶ 30, 36). Smith concedes that on September 19, 2012, while he was still in Afghanistan, he was told by Kassiri that Integral was reducing the salary that they had agreed upon. (*Id.* at ¶ 37).

Smith admits that he had difficulties leaving Afghanistan and returning stateside and it appears to have taken him around three weeks to accomplish this move. (*Id.* at ¶ 32). His email correspondence indicates that he arrived in Kuwait on Saturday, September 22, 2012 but missed the

connecting flight to the United States which was scheduled for that day. (Docket No. 16-6 at 3). As a consequence, he was scheduled to leave Kuwait on the next flight on Saturday, September 29, 2012, on which he would travel to the United States on Sunday and then be able to process out of Camp Atterbury, Indiana on Monday, October 1. (*Id.*). While Smith remained in Kuwait, Thomas Williams of Integral emailed him a revised offer letter on September 27, 2012, offering a base salary to $76,000 and outlining other benefits information. (Docket No. 16-5). The revised offer letter contained the same language as the earlier letters, stating that "[t]his offer is an offer for employment at will and is not in any way an offer either implied or expressed, for employment for any term or guarantee of employment for any term." (*Id.*). In obvious error, the revised offer letter still referenced a start date of around September 17, 2012 and asked for it to be returned by September 12, 2012. (*Id.*).

Smith went back to Butler County after he arrived in the United States in early October of 2012. (Docket No. 15 at ¶¶ 39-40). He signed the revised offer letter upon his return and faxed it from his girlfriend's residence, leaving a (724) prefix on the faxed documents. (*Id.* at ¶ 41). His email correspondence indicates that he sent the fax to Integral around Friday, October 5, 2012. (Docket No. 16-6). Smith declares that after he accepted his offer, his girlfriend resigned her position at her employment in Pennsylvania and requested a transfer to Charlottesville. (*Id.* at ¶ 43). They then started looking for a new home in Virginia and schools for his girlfriend's children to attend. (*Id.*).

Smith soon reached out to Kassiri, Williams and VP Johri via email and telephone seeking information about his start date. Smith avers that during one of these phone conversations he informed Integral that his girlfriend and her children would be relocating with him to Virginia after

Integral provided a start date. (*Id.* at ¶ 44). He was told by Kassiri that the government was staggering start dates and that he would have to wait for his date to be finalized. (*Id.* at ¶ 42). Williams advised Smith via email on October 11, 2012 the Charlottesville office was aware of his situation and that they needed to go through all the necessary processes to provide a start date for him. (*Id.* at ¶ 45; Docket No. 16-6). On the next day, Smith called VP Johri about his start date, who told Smith that the government client had yet to approve him to work on the BIP contract. (Docket No. 15 at ¶ 46). Smith avers that no one from Integral had ever advised him prior to that conversation that they were awaiting approval or that his job offer was conditioned on approval by the government. (*Id.* at ¶ 47). He contacted Kassiri and she stated that she was unaware that Integral was awaiting or needed approval for him to start but agreed to let him know of any further developments. (*Id.* at ¶ 48). A few days later, Smith contacted Kassiri a final time and she said that they had heard nothing further on his application, adding "I'm really, really sorry, but at this point it is safe to say that you are not going to be approved because it shouldn't take this long." (*Id.* at ¶ 49).

Integral then sent a letter to Smith via email on October 19, 2012, which Smith received in Butler County. (*Id.* at ¶ 50). In relevant part, the letter states that:

> We regret to inform you that [Integral] provides notice that we are rescinding your offer of employment as an *Intelligence Analyst*.

> As you are aware, Integral submitted your name to our client for the [BIP contract] in Charlottesville, VA. However, as a condition of our contract, the government must consent to hiring decisions of Integral before we can staff the position. We had every expectation that candidates would join Integral as a result of this process, but in your case the government would not provide consent to begin performance.

> Because of the above, Integral has no other option but to rescind you offer of employment.

(Docket No. 15-4 at 2).  Unlike the other letters, this one is addressed to Smith at a specific address on Knight Court in Charlottesville, Virginia – the same one that Smith provided on his resume. (*Id.*). The letter is signed by Williams as Senior Human Resources Manager.  (*Id.*).

In his Complaint, Smith sets forth three separate causes of action against Defendant, i.e., fraudulent inducement, negligent misrepresentation and breach of contract.  (Docket No. 1-2). Supporting his fraudulent inducement claim, Smith contends that Integral intentionally misrepresented to him that he had a secure position on the BIP contract but failed to disclose that it had yet to obtain approval or that its offer was subject to any contingency, thereby inducing him to resign his employment in Afghanistan and relocate to the United States to pursue employment at Integral.  (*Id.* at ¶¶ 35-40).  Smith relies on the same core facts to support his claim for negligent misrepresentation, arguing alternatively that Integral was negligent in failing to make the disclosures concerning the need for approval and/or any contingency.  (*Id.* at ¶¶ 41-46).  For his breach of contract claim, Smith maintains that the circumstances indicate that he was made an unconditional offer of employment with Integral, which allegedly gave rise to an implied right to a reasonable term of employment and was breached by Integral when it rescinded the offer.  (*Id.* at ¶¶ 47-53).  Smith seeks consequential damages in the form of unpaid salary, health and pension benefits, relocation benefits and out-of-pocket expenses, pre- and post-judgment interest, costs of suit, reasonable attorneys' fees and any other available relief.  (*Id.*).

III. PROCEDURAL HISTORY

Smith initiated this case by filing his Complaint in the Court of Common Pleas of Butler County on April 3, 2014. (Docket No. 1-2).  Integral responded by removing the case to this Court on

May 8, 2014. (Docket No. 1). Integral filed the pending Motion to Dismiss, along with its Brief in Support and supporting evidence on May 23, 2014. (Docket Nos. 6, 7). The Court granted two requests by Smith seeking extensions of time to respond to Integral's Motion in order to afford him the opportunity to conduct written discovery and serve document requests on Integral prior to filing his opposition. (Docket Nos. 12, 14). After this limited discovery was completed, Smith then filed his Declaration and supporting evidence on August 11, 2014 and added his Brief in Opposition the following day. (Docket Nos. 15, 16). Integral countered by filing its Reply Brief on August 27, 2014. (Docket No. 18). No further briefing has been requested and the matter is now ripe for disposition.

IV. LEGAL STANDARD

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a court may dismiss a complaint for lack of personal jurisdiction. FED. R. CIV. P. 12(b)(2). "Once a defendant challenges a court's exercise of personal jurisdiction over it, the plaintiff bears the burden of establishing personal jurisdiction." *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009). If an evidentiary hearing is not held, "the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor."[2] *Id.* (quoting *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004))).

---

2       The Court notes that it recognizes its authority to order the parties to conduct discovery on contested jurisdictional issues and to hold an evidentiary hearing to permit the parties to present evidence on these issues. Indeed, this Court has ordered both discovery and evidentiary hearings in prior cases where personal jurisdiction has been contested by the parties, *see e.g., Hufnagel v. Ciamacco*, 281 F.R.D. 238 (W.D. Pa. Mar. 20, 2012); *Rychel v. Yates*, 2011 WL 1363751 (W.D. Pa. Apr. 11, 2011). Here, Smith has served written discovery and document requests on Integral and the parties have presented affidavits and other documentary evidence in support of their respective positions. Neither party has requested that the Court conduct an evidentiary hearing and the Court declines to do so *sua sponte*.

In Pennsylvania, courts are authorized to exercise personal jurisdiction over a defendant to the full extent permitted under the Federal Constitution. *See IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 258–59 (3d Cir. 1998); *see also* 42 PA. CONS. STAT. § 5322(b). The Due Process Clause protects defendants from binding judgments of foreign states with which the defendants had no significant "contacts, ties, or relations." *Burger King v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (quoting *Int'l Shoe v. Wash.*, 326 U.S. 310, 319 (1945)). Due process requires that a defendant be provided a "fair warning" and a "degree of predictability" regarding how its conduct may subject it to legal process and liability in a particular forum. *Burger King*, 471 U.S. at 472.

Personal jurisdiction may be established in accordance with these Constitutional principles through a showing of general or specific jurisdiction. Only specific jurisdiction is relevant to this matter. "Specific jurisdiction" is "personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). To establish specific personal jurisdiction, a plaintiff must show that a defendant had fair warning that he or she was subject to legal process in a particular state because the defendant had "minimum contacts" with the state. *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (citing *Burger King*, 47 U.S. at 472). A court usually determines specific jurisdiction on a claim-by-claim basis. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 318 n.3 (3d Cir. 2007) (citing *Remick v. Manfredy*, 238 F.3d 248, 255–56 (3d Cir. 2001)). Under the "traditional test" of specific personal jurisdiction, the plaintiff must demonstrate each of the following:

> First, the defendant must have purposefully directed its activities at the forum. Second, the litigation must arise out of or relate to at least one of those activities. And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comports with fair play and substantial justice.

11

*O'Connor*, 496 F.3d at 317 (internal quotations omitted).  In intentional tort cases, specific personal jurisdiction is evaluated under the *Calder* "effects test" which necessitates a plaintiff to prove these factors:

> (1) The defendant committed an intentional tort; (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*IMO Indus., Inc.*, 155 F.3d at 265-66 (citing *Calder v. Jones*, 465 U.S. 783, 804 (1984)).

V.  DISCUSSION

It is undisputed that Integral is a citizen of Maryland and that it does not have continuous and systematic contacts with Pennsylvania precluding this Court from exercising general personal jurisdiction over Integral.  (Docket Nos. 7, 16, 18).  Hence, the disputes between the parties involve whether Integral's alleged claim-specific actions are sufficient for the Court to find that it has specific personal jurisdiction over this case.  (*Id.*).  In support of its Motion to Dismiss, Integral contends that Smith has failed to meet his burden to establish a *prima facie* case of specific personal jurisdiction as to his fraudulent inducement, negligent misrepresentation and breach of contract claims.  (Docket Nos. 7, 18).  Smith counters that he has presented sufficient evidence of Integral's contacts with him while he was in Pennsylvania such that it would not offend the applicable Constitutional principles to direct Integral to defend his claims in this District.  (Docket No. 16).  As noted above, the Court is required to apply slightly different tests to analyze whether personal jurisdiction is appropriate over Smith's separate civil claims and first turns to its evaluation of the breach of contract action.

## a. Breach of Contract

In a breach of contract case, the Court "consider[s] the totality of the circumstances, including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing." *Remick*, 238 F.3d at 256 (citation omitted). Merely contracting with a resident of the forum state is not sufficient to confer personal jurisdiction over a nonresident. *See Grand Entm't Group v. Star Media Sales*, 988 F.2d 476, 482 (3d Cir.1993) ("[A] contract alone does not 'automatically establish sufficient minimum contacts in the other party's home forum.'") (quoting *Burger King*, 471 U.S. at 478). However, "[p]arties who reach out beyond [their] state and create continuing relationships and obligations with citizens of another state are subject to the regulations of their activity in that undertaking." *General Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001). A defendant need not physically enter the forum -- as communications by email, mail and telephone may suffice if such contacts through these media amount to deliberate targeting of the forum by the defendant. *O'Connor*, 496 F.3d at 317 (citations omitted). But, the "unilateral activit[ies] of those who claim some relationship with a nonresident defendant" and "contacts with a state's citizens that take place outside the state are not purposeful contacts with the state itself." *Id.* (quotation and citation omitted). Further,

> [w]here the only contacts an out of state defendant has with the forum state are that it concluded a contract with a forum state plaintiff and sent some related communications to that plaintiff, and where the contract negotiations were initiated by the plaintiff, the contract is to be performed entirely outside the forum state, the contract does not contain a choice-of-law clause designating the application of forum state law, and the contract does not create long-term or substantial ties with the forum state, the defendant does not have sufficient contacts.

*Hufnagel*, 281 F.R.D. at 246-47 (quoting *Rotondo Weinreich Enterprises, Inc. v. Rock City*

*Mechanical, Inc.*, No. Civ. A. 04–5285, 2005 WL 119571 (E.D. Pa. Jan. 19, 2005)).

At issue in this case is an alleged employment agreement between the parties pursuant to which Smith contracted with Integral to work as an intelligence analyst at its Charlottesville, Virginia location. (Docket No. 1-2). The contract has no connection to Pennsylvania as performance by both parties was expected to take place in Virginia and, possibly, Maryland. The terms of the written offer letters also provide no reference to Pennsylvania law controlling any aspect of the parties' relationship and there are no clauses such as notice, identification, choice of law or venue in the offer letters executed by Smith. (Docket No. 1-2, Exs. 1, 4, 5). It cannot be meaningfully disputed that Virginia law would have governed the employment relationship between Smith and Integral had it commenced as they both expected at one time. Hence, the Court finds that personal jurisdiction over Integral is lacking given the nature of the parties' prospective relationship, which required performance of the contract in the Commonwealth of Virginia, subject to Virginia laws. *See e.g.*, *Rychel*, 2011 WL 1363751, at *14-16.

Despite same, Smith contends that Integral reached into Pennsylvania to recruit him and that its email and telephone contacts with him during the recruitment process and his acceptance of two of Integral's offers (i.e., the first in April 2012 and third in September 2012) while he was physically located in Pennsylvania provide sufficient contacts to justify the exercise of personal jurisdiction. Certainly, active recruitment of a Pennsylvania resident by an out-of-state corporation may produce sufficient minimum contacts that the corporation could reasonably be expected to be sued in this District. As Smith points out, the decision of *Watson v. Blessey Marine Services, Inc.*, 2011 WL 5878050, *4 (W.D. Pa. 2011), sets forth the type of circumstances where the exercise of jurisdiction was appropriate due to the corporation's recruiting efforts it directed toward Pennsylvania. But,

14

*Watson* is distinguishable from this case because the plaintiff in *Watson* was always a Pennsylvania resident, had numerous contacts with the nonresident defendant while he remained in Pennsylvania and, among other things, was flown out of Pennsylvania by the company for an interview. *Id.* Thus, the company literally reached into Pennsylvania to bring the plaintiff to its out-of-state locale and it was reasonably foreseeable that the company could be sued in Pennsylvania when it revoked an offer given the numerous contacts the company had with this jurisdiction. *Id.* In contrast, the facts of this matter are very different from *Watson* because Integral's contacts with Pennsylvania concerning the contract with Smith which was allegedly breached were not purposefully directed to this forum but were informational in nature and/or resulted from Smith's unilateral activities moving to this forum during the negotiations.

Here, the scope of Smith's breach of contract claim does not rely on the express terms of the three separate offer letters, which he executed and to which he assented. (Docket No. 1-2). Indeed, each of the offer letters expressly state that "[t]his offer is an offer for employment at will and is not in any way an offer either implied or expressed, for employment for any term or guarantee of employment for any term." (*Id.*, Exs. 1, 4, 5). Instead, Smith relies on the parties' correspondence and telephone communications to demonstrate that he was made an "unconditional offer" which he accepted. (*Id.* at ¶ 48). He alleges in his Complaint that he "provided additional consideration to Integral, by resigning his job in Afghanistan; moving back to the U.S.; and arranging to relocate," in September and October of 2012. (Docket No. 1-2 at ¶ 49). Smith contends that these activities "gave rise to an implied contract term requiring Integral to employ him for a period that is 'reasonable' under the circumstances" and that such agreement was breached when Integral revoked Smith's offer in October of 2012, after he had returned to the United States. (*Id.* at ¶¶ 49-53).

15

In this Court's opinion, since Smith is proceeding under this theory of additional consideration he allegedly provided to Integral in September and October of 2012, it is clear that Smith's breach of contract claim does not directly "arise out of or relate" to the first offer, *O'Connor*, 496 F.3d at 317, because there is no "substantive relevance" between the alleged contract and these earlier contacts in April and May of 2012, *id.* at 320. The first offer was also subject to the expressly stated contingency that the parties were not bound until Integral was awarded the BIP and such contingency was not met until after Smith had already told Integral he was pursuing another opportunity. (Docket No. 1-2, Ex 1). At most, the contacts Integral had with Smith while he was in Pennsylvania in April and May of 2012 should be characterized as "prior negotiations" regarding the agreement that he is now claiming was breached. *See Vetrotex Certainteed Corp. v. Consol. Fiber Glass Products Co.*, 75 F.3d 147, 153 (3d Cir. 1996) ("*Burger King*'s reference to 'prior negotiations,' 'future consequences,' 'terms of the contract,' and 'course of dealing,' however, clearly contemplates dealings between the parties in regard to the disputed contract, not dealings unrelated to the cause of action."). But the contacts Integral had with Smith around that time are unrelated to the present agreement and it is this Court's belief that the quality of the contacts are not sufficient to subject it to this Court's jurisdiction. *Id.*

To this end, the parties' initial negotiations commenced while Smith was in Virginia and he then unilaterally relocated himself to Pennsylvania after his contract position with another company ended. *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."). But, Smith continued to maintain an apartment in Virginia around this time; kept important documents containing sensitive personal information at the apartment; made trips there

independent of the negotiations; and continued to list the Virginia address on the resume that he used to support his application at Integral. (Docket No. 15 at ¶¶ 12, 13). While Smith advised Integral that he had returned to Pennsylvania, the parties' correspondence via email and telephone around this time communicating about the position in Virginia does not demonstrate the type of purposeful availment by the company to recruit a Pennsylvania resident as was present in *Watson*. *Cf. Watson*, 2011 WL 5878050, *4. In any event, Smith later terminated any agreement the parties had reached as a result of the first offer by accepting employment with another company and notifying Integral of that decision. *See Vetrotex*, 75 F.3d at 153-54 (holding that negotiations as to prior contract which was terminated were unrelated to specific personal jurisdiction inquiry). He then relocated to Afghanistan in July of 2012, effectively ending their relationship at that point. *Id.*

The Court also holds that Integral's contacts with Smith surrounding the second and third offers are not sufficient to establish personal jurisdiction over Integral in this District. The parties agree that Integral reached out to Smith while he was in Afghanistan; actively recruited him to return to the United States and work at Integral in Virginia; that they engaged in negotiations through email and telephone communications about the terms and conditions of his potential employment; and, that Integral extended two separate offers of employment to Smith while he was abroad, (i.e., on September 10, 2012 and September 27, 2012). (Docket Nos. 1-2; 15). Smith admits that he signed and returned the second offer to Integral immediately while he was in Afghanistan. (Docket No. 15 at ¶¶ 29-30). Yet, Smith argues that Integral's contacts with him while he was in Afghanistan represent contacts with Pennsylvania because he continued to maintain that he was a permanent resident of Pennsylvania during this time. (Docket No. 16). But, "contacts with a state's citizens that take place outside the state are not purposeful contacts with the state itself," and "[c]ontact[s]

with vacationing Pennsylvanians [are] no substitute for contact[s] with Pennsylvania." *O'Connor*, 496 F.3d at 317-318. Following this precedent, Integral's contacts with Smith during his employment in Afghanistan cannot substitute for contacts with Pennsylvania. *See id.* Accordingly, Integral's recruitment of Smith while he was in Afghanistan and its related activities are not enough to permit Smith to sue Integral in Pennsylvania for breaching an agreement resulting from those contacts.

Smith further points to the facts that he executed and returned the third and final offer letter to Integral from Butler County; participated in other email and telephone contacts with Integral after he returned to the United States; and, received the letter terminating his offer via email while he was in Pennsylvania. (Docket No. 16). For many of the same reasons, the Court is not convinced that these activities demonstrate purposeful availment by Integral to do business within Pennsylvania or even to recruit Smith to leave Pennsylvania and work in Virginia.

Looking at the "totality of the circumstances" between the parties, Smith's adding his signature on the third offer letter was a mere formality. *See Remick*, 238 F.3d at 256. He had previously signed the second offer letter in Afghanistan and had made arrangements to return to the United States. (Docket No. 15 at ¶¶ 29-30). He was also advised nearly two weeks before he received the third offer letter that the compensation package offered by the company was being reduced and his email correspondence demonstrates that he essentially agreed to the reduction by continuing on his journey stateside. (*Id.* at ¶¶ 37-38). Thus, the formalization of the third offer letter with the addition of Smith's signature[3] only occurred within Pennsylvania because Smith was abroad when he received the email from Integral and likely did not have the necessary facilities to print out

the document and return it from his then locale.

Most of the subsequent communications were initiated by Smith or responded to him within Pennsylvania only because he unilaterally decided to return here rather than directly to Virginia where he was supposed to perform under the contract. Further, the content of those communications was purely informational in nature concerning his start date and reasons for the delays. *See, e.g., Randall v. Davin*, Civ. A. No. 13-703, 2013 WL 6191344, at *5 (W.D. Pa. Nov. 26, 2013) (Conti, J) ("there is also no evidence that [the plaintiff's] location during any particular communication was dictated or directed by defendant. The only reasonable inference from the totality of the record before the court is that [the plaintiff's] location at any given time was the result of [his] unilateral decision about where to conduct his business on that day."); *Square D Co. v. Scott Elec. Co.*, Civ. A. No. 06-459, 2008 WL 4462298, at *9 (W.D. Pa. Sept. 30, 2008) (citing *Vetrotex Certainteed Corp. v. Cons. Fiber Glass Products Co.*, 75 F.3d 147, 152 (3d Cir. 1996)) ("[T]he Third Circuit Court of Appeals in *Vetrotex* recognized that 'informational communications' between a resident and non-resident in connection with the formation of a contract alone were insufficient to establish personal jurisdiction."). The same holds true as applied to the October 11, 2012 letter Integral sent to Smith via email rescinding the previously-communicated offers on the basis that he was not approved to work on the BIP contract. Again, Smith only received this letter in Pennsylvania because he chose to relocate here and Integral had no control over where he lived or received this email.

For these reasons and upon consideration of the totality of the facts and circumstances, the Court finds that it lacks personal jurisdiction over Integral as to the breach of contract claim.

   b. *Fraudulent / Negligent Misrepresentation Claims*

---

3       *See* n.1, *supra*.

Integral next argues that the Court lacks specific personal jurisdiction over it as to Smith's fraudulent and negligent misrepresentation claims. (Docket Nos. 7, 18). Smith contends that Integral has sufficient contacts with him in this forum to subject it to personal jurisdiction here. (Docket No. 16). The Court agrees with Integral's position and finds that specific jurisdiction over Integral is lacking regarding the misrepresentation claims.

For specific jurisdictional purposes, negligence claims are generally evaluated under the "traditional test" while fraudulent inducement claims are analyzed under the more stringent *Calder* "effects test." Smith has asserted alternative theories supported by overlapping allegations and jurisdictional proof such that the fraudulent and negligent misrepresentation claims may be evaluated together initially. *See O'Connor*, 496 F.3d at 318, n.3. It is well settled that fraudulent communications made within a forum or directed to a forum are sufficient contacts to subject a nonresident defendant to personal jurisdiction in litigation arising from those communications. *See Gehling*, 773 F.2d at 544; *see also Leone v. Cataldo*, 574 F. Supp. 2d 471, 479-80 (E.D. Pa. Aug. 11, 2008). But, the same general principles discussed above in the context of the breach of contract claim apply to evaluate the nature and quality of the claim-specific contacts that Integral had with this forum.

The Court's analysis again starts with Smith's Complaint, through which he is seeking to remedy actions and/or omissions allegedly directed by Integral toward him via email and telephone communications which took place while he was in Afghanistan in September of 2012. (Docket No. 1-2 at ¶¶ 35-46). Smith contends that Integral's communications induced him to leave stable employment and return to the United States to pursue the position with Integral in Virginia. (*Id.*).

The claimed misrepresentations include that he was told he had a secure position at Integral and a confirmed spot if he returned expeditiously. (*Id.*). The asserted material omissions surround Integral's failure to advise him that his prospective employment was subject to approval by the government and/or any other contingency. (*Id.*).

In this Court's estimation, all of these alleged tortious acts were directed to Smith while he was in Afghanistan and have no connection to Pennsylvania. *See O'Connor*, 496 F.3d at 317. Further, the earlier communications in April and May of 2012 could not have induced Smith to leave Afghanistan because he did not move to that country until July of 2012. He also voluntarily walked away from the first offer he accepted from Integral and the alleged tortious communications by Integral occurred during the parties' subsequent negotiations in September of 2012. In either event, Integral did not purposefully avail itself to being sued in this forum by pursuing Smith for an employment contract while he was abroad. Accordingly, the Court finds that the factors under the "traditional test" cannot be met for either claim. *See O'Connor*, 496 F.3d at 317.

As noted above, the fraudulent misrepresentation is evaluated under the more stringent "effects test" which requires, among other things, a demonstration that the nonresident "expressly aimed" its tortious conduct at the forum and that the forum is the "focal point" of the harm sustained by the resident plaintiff. *See Gehling*, 773 F.2d at 544 ("the cause of action arises from defendants' in-state activities, and the defendants' misrepresentation, which occurred and caused injury in Pennsylvania to Pennsylvania residents"); *see also Rychel*, 2011 WL 1363751 at *13 ("to establish that a defendant expressly aimed his conduct, the plaintiff has to demonstrate the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed his tortious conduct at the

21

forum."). Certainly, there is no evidence that Integral expressly aimed its alleged September 2012 fraudulent communications to this forum. In addition, while it may be true that Smith has felt some of the harm of the alleged tortious activity in Pennsylvania, such harm was felt here only because Smith unilaterally chose to relocate into this area. The balance of the harm sustained by Smith necessarily occurred in Afghanistan given his decision to leave his well-paying job there to pursue the position with Integral. Following the applicable precedent, it is clear to this Court that Pennsylvania cannot be the focal point of the claimed tortious activity. *See Rychel*, 2011 WL 1363751 at *16.

Based on the foregoing, the Court holds that Smith has failed to meet his burden to establish specific personal jurisdiction over Integral for the fraudulent and negligent misrepresentation claims.

  *c. Conclusion/Transfer*

Because this Court lacks personal jurisdiction over Integral, the question remains whether the Court should dismiss this action or transfer it to an appropriate District Court pursuant to 28 U.S.C. § 1631. *See Gehling,* 773 F.2d at 544 (stating that a district court lacking personal jurisdiction can transfer a case to a district in which the case could have originally been brought). Section 1631 provides, in pertinent part:

> Whenever a civil action is filed in a court ... and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed ... and the action ... shall proceed as if it has been filed in ... the court to which it is transferred on the date upon which it was actually filed in ... the court from which it is transferred.

28 U.S.C. § 1631.

In this Court's opinion, the interests of justice are better served if this case is transferred to the United States District Court for the District of Maryland, rather than dismissed. Personal jurisdiction over Integral is proper in that court. Smith has conceded that the District of Maryland is an appropriate forum and has also requested that the case be transferred to that District rather than dismissal.

VI. CONCLUSION

Based on the foregoing, Integral's Motion to Dismiss [6] is granted and this matter will be transferred to the United States District Court for the District of Maryland. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date: September 29, 2014

cc/ecf: All counsel of record.